# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **8:04CR372** |
| **vs.** ) | |
| ) | **REPORT AND** |
| **STANISLAUS ODOH,** ) | **RECOMMENDATION** |
| ) | |
| **Defendant.** ) | |

This case is before the court on defendant Stanislaus Odoh's MOTION TO SUPPRESS (#22). An evidentiary hearing on the motion was held August 11, 2005. The transcript of the proceeding (#33) was filed August 22, 2005, at which time the motion was deemed submitted.

## ISSUES PRESENTED

On April 19, 2004 Stanislaus Odoh was operating a semi tractor-trailer on Interstate 80 when he entered the Waverly inspection station and encountered a Nebraska State Patrol trooper who initiated inspections based on the North American Standard Inspection Procedure. While the trooper found no violations, he continued to engage Odoh in conversation, including questions concerning the presence of contraband in the vehicle. Odoh gave both verbal and written consent to search his semi tractor and car-transport trailer. Acting on the consents, a search occurred which resulted in the seizure of a large quantity of marijuana.

Odoh moves the court for an order suppressing the evidence which he alleges resulted from his unlawful detention following the safety inspections[1], that the detention was without reasonable suspicion or probable cause and that his consents were not voluntary, all in violation of his rights under the Fourth Amendment to the United States Constitution.

## FACTUAL BACKGROUND

Jeremy Scott Dugger testified he is a trooper with the Nebraska State Patrol, currently assigned as a canine handler within the carrier enforcement division. On April 19, 2004 he was working the Waverly weight scales along Interstate 80 in Cass County, Nebraska, when he made contact with Stanislaus Odoh.

Dugger testified that at approximately 8:00 p.m., he observed a semi tractor, driven by Odoh, pulling a car-transport loaded with three vehicles, drive onto the scale platform (11:9-11). He observed the DOT number on the semi tractor was high, indicating that the trucking company was newly formed (11:12-14). He noted the company name, Odoh Group, Inc., on the side of the truck, but could not locate the company name in his computer. He instructed Odoh to park the vehicle and to enter the scale building for an inspection (13:6-14).[2] Trooper Dugger told Odoh he wanted to check his paperwork and perform a Level 3 inspection. However, after Odoh told him that the vehicle had problems with both

---

[1] Odoh admits that his initial contact with Trooper Dugger was appropriate, but claims at some point he was unlawfully detained (5:4-17).

[2] Exhibit 1, a videotape, memorializes the contact between Trooper Dugger and Odoh in the front area of the scale building.

the power unit and the trailer, Trooper Dugger decided he would also complete a Level 2 inspection to insure that the vehicle was fit for the road (14:10-19).

Trooper Dugger testified that during the inspections, Trooper Frederick was present, but that he was the one who asked Odoh for his paperwork. Dugger told Odoh that he was going to do a Level 3 paperwork inspection involving apportion, cab registration, single state registration, international fuel tax agreement form, and various other permits. The inspection also included a check of the log book, medical certificate, driver's license, and shipping papers. Trooper Dugger noted the trucking industry is heavily regulated and drivers are frequently subject to inspection and are familiar with the process. As the inspection continued, Trooper Dugger noted that Odoh was unable to produce bills of lading or shipping papers for his cargo of three vehicles (17:14-24).

Trooper Dugger testified that several things drew his attention and raised a "red flag":

a)   The vehicle's unit number display was 5437, which is a high number associated with the five thousandth four hundred thirty-seventh truck in a group. Odoh Trucking Company, however, had only one truck (19:2-11).

b)   The trailer's registration number was 2,004, indicating that the owner was trying to make the company seem bigger than it really was. Also, the registration was handwritten, not printed, making Dugger question if it was valid (19:17-25).

c)   Odoh stated that he had just purchased the truck and the trailer; however, he could not recall exactly where he had purchased them. Odoh stated that he purchased the units sight unseen and was disappointed when he found they had several mechanical problems (20:1-9).

d)   At first, Odoh could not produce the shipping papers for the three vehicles he was hauling. He did, however, find the titles for two of the vehicles–a Ford Taurus and a Buick LeSabre (20:15-24). However, the title to the Buick concerned

>   Trooper Dugger because it was an open title, with no current owner. This seemed odd to Trooper Dugger because cars should not be transported with open titles because there is no way to track where the automobile came from or where it was going (21:1-9). Trooper Dugger also thought it was odd that Odoh could not produce a title to the third vehicle, a pickup truck (22:5-15).
>
>   e)  A review of the log books concerned Trooper Dugger because three days of down time in the Arizona area was listed as "shop" indicating to Trooper Dugger that the truck was broken down and in the shop. To Trooper Dugger, down time prior to a trip, is a strong indicator of criminal activity as oftentimes people who transport narcotics sit two or three days waiting to pick up their true load, narcotics (21:16-25).

Trooper Dugger testified that after he completed the Level 3 inspection, he asked Odoh to pull the vehicle into the inspection bay (22:19-23). Once in the inspection bay, Trooper Dugger conducted a Level 2 inspection (which is an exterior inspection) a check of the tires, tire tread, tire pressure, lug bolts, lights, windshield wipers, windshield, and other emergency warning equipment (23:9-16).

Trooper Dugger testified that after finishing the inspection, he and Odoh returned to a computer terminal in the front inspection area. As Trooper Dugger entered the information, he engaged Odoh in a general conversation about his trip. Odoh told him he was traveling from Arizona and had stopped twice to pick up the cars for transport to Chicago. This concerned Trooper Dugger because he knew Arizona and Nevada were known origins, and Chicago was a known destination for narcotics (25:10-20). As Trooper Dugger handed the inspection report to Odoh, along with Odoh's paperwork, he continued to ask questions. However, Odoh interrupted him stating that he was missing one of his papers. Trooper Dugger stopped asking questions and helped Odoh look for the missing paper. After

determining the paper was not in the front or back inspection area, Odoh located the paper in his truck (26:1-14). Trooper Dugger then asked Odoh if he could ask him a couple more questions.[3] He asked Odoh if he was transporting any illegal narcotics. Odoh responded that he wasn't but, "If you want to take a look, go, go take a look." (26:14-25). Trooper Dugger then asked if it would be okay if he searched Odoh's vehicle. Odoh replied, "Yes sir, yes, sir." (Ex. 3). Trooper Dugger then gave Odoh a written consent form, which he read to Odoh. Odoh stated he understood, that he had no questions, and he signed the form (27:10-17). Trooper Dugger and Frederick then searched Odoh's vehicle. In the bed of the Chevy pickup they located approximately 18 black plastic bags of marijuana (32:23-33:9).

On cross-examination Trooper Dugger testified that Odoh told him he was only going to make about $700 per vehicle, but was going to get an extra $100 for going out of his way to Las Vegas and that he agreed with Trooper Dugger that he was not going to make much money on the trip (44:4-18). Trooper Dugger stated that when Odoh first entered the inspection building, his hands were shaking very rapidly, as if they were vibrating, when he handed his paperwork to Trooper Dugger. Trooper Dugger also noted that Odoh's palms were very sweaty and that he wiped his palms on his shirt a couple of times (45:23-46:5).

Trooper Dugger testified that he made an extensive list of the things he thought suspicious, which he included in his report (46:24-47:9). However, he admitted he did not put anything in the report about Odoh being nervous or that his hands were shaking or

---

[3]The contact between Trooper Dugger and Odoh concerning the verbal consent to search is memorialized on Exhibit 3.

sweating (47:15-22).  Trooper Dugger admitted that he told Odoh he had no violations and had passed the inspections (52:12-16; 58:20-24).

Trooper Dugger testified that after the inspection report was completed and Odoh had signed the report, he continued to ask questions as Odoh packed up his papers (59:1-12). Trooper Dugger admitted asking Odoh about currency and drugs and Odoh responded that he did not know anything about that, but volunteered that he had $1,000 in the truck (59:17-23).  When Trooper Dugger asked Odoh whether or not he knew anything about trafficking of drugs and Odoh realized he was missing some of his papers (60:11-20).

On cross-examination Trooper Dugger testified that in addition to the camera in the front inspection office, there is a camera in the rear inspection area and it was in the rear inspection area that he asked for Odoh's consent to search (Ex. 3).  However, Trooper Dugger noted that the video ends about half-way through the reading of the consent form because the tape ran out (64:18-65:7).

On cross-examination Trooper Dugger admitted that while he was suspicious about the numerous issues he listed in his report, Odoh had supplied possible explanations for each of the items (69:13-23).

On redirect examination Trooper Dugger testified that his suspicions led him to ask Odoh for permission to search (71:5-8).

## LEGAL ANALYSIS

With certain modifications, the parts of the federal Motor Carrier Safety Regulations, 49 C.F.R., in existence and effective as of January 1, 2004, were adopted as Nebraska law. *See* Neb. Rev. Stat. §75-363(1). For the purpose of enforcing the safety regulations applicable to defendant's tractor-trailer, any officer of the carrier enforcement division of the Nebraska State Patrol or any officer of the Nebraska State Patrol may, upon demand, "inspect the accounts, records, and equipment of any carrier or shipper," Neb. Rev. Stat. § 75-366, or "conduct a safety review or safety compliance audit of a motor carrier." Neb. Rev. Stat. § 75-369.01. In this regard, "state law 'can be relevant in determining what is reasonable under the Fourth Amendment.'" *United States v. Belcher*, 288 F.3d 1068, 1070 (8th Cir. 2002). It is undisputed that defendant Odoh stopped at the weigh station for a routine examination for compliance with federal and state safety and hauling regulations. Trooper Dugger's testimony explains why he was concerned about several matters involving Odoh's responses to questions and Odoh's paperwork.

As did the defendant in *United States v. Johnson*, 285 F.3d 744 (8th Cir. 2002), Odoh concedes the validity of the initial weigh station stop and inspection, but contends his detention was unjustly extended in violation of his Fourth Amendment rights and that the evidence seized as a result must be suppressed. Odoh also contends that because his continued detention was illegal, his written and verbal consents are invalid.

An officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the original reason for the stop and detain a vehicle and its occupants for further investigation. *United States v. Johnson*, 285 F. 3d at 749 (citing *United States v. Poulack*, 236 F.3d 932, 935-36 (8th Cir.), *cert. denied*, 534 U.S. 864 (2001)). Whether an officer had reasonable suspicion to expand the scope of a stop is determined by examining the totality of the circumstances, in light of the officer's experience. *Id.*

Here, a combination of factors heightened Trooper Dugger's suspicions that this particular vehicle was being used for criminal activity, including the high vehicle unit number, the handwritten trailer registration, the trailer's high registration number, the recent purchase of the units, Odoh's inability to remember where he purchased the vehicles, Odoh's inability to produce in a timely manner the titles to the three vehicles he was carrying, the open title to the Buick, the three "shop" days in Arizona, and that the trip originated in Arizona, a known drug source area, and was to terminate in Chicago, a known destination for drugs.

Trooper Dugger then advised Odoh there were no violations, and Odoh's papers were returned to him. I find that Odoh was no longer seized within the meaning of the Fourth Amendment after these items were returned. *See United States v. Santos-Garcia*, 313 F.3d 1073, 1078 (8th Cir. 2002).

It was at this point, following the search for Odoh's missing paper, that Odoh, in a response to a question about drugs, told Trooper Dugger, "if you want to take a look, go take

a look." I conclude that this encounter was consensual. If the encounter after the completion of the inspection was consensual, then the Fourth Amendment would not prohibit Trooper Dugger from asking questions unrelated to the inspection or from seeking consent to search the tractor-trailer. *See United States v. Santos-Garcia*, 313 F.3d at 1078. Trooper Dugger did not "seize" Odoh by talking to him about drugs or asking for permission to look, as a reasonable person would have felt free to deny permission and leave under such circumstances. *See United States v. Morgan*, 270 F.3d 625, 630 (8th Cir. 2001), *cert. denied*, 537 U.S. 849 (2002).

I find credible Trooper Dugger's testimony that he told Odoh there were no violations and that everything was fine. Nothing in the record suggests that Odoh could reasonably have believed he was required to engage in further conversation with Trooper Dugger; therefore, the court finds that Odoh's further conversation with Trooper Dugger was also consensual. *See United States v. Morgan*, 270 F.3d at 630. It was during this consensual encounter that Odoh gave his verbal permission to search the vehicle.

The record also shows that Odoh subsequently signed a written form (Ex. 2) giving Trooper Dugger permission to search his vehicle. The form specifically advised Odoh he had the right to not allow the search. There is no evidence that Odoh did not understand what he was signing or that Odoh's consent was involuntary for any reason.

In the alternative, should the district court find that these conversations were not consensual, I find that grounds for reasonable suspicion, summarized above, were generated

in the course of the initial questioning and inspections and were sufficient to justify engaging Odoh in conversation after the inspections concluded. *See United States v. Johnson*, 285 F. 3d at 749.

## RECOMMENDATION

In summary, Odoh's vehicle was legally stopped for carrier enforcement purposes. Trooper Dugger conducted the inspection appropriately, returned Odoh's papers to him; however, he engaged in consensual conversation with Trooper Dugger and subsequently gave Dugger verbal and written permission to search the trailer. In the alternative, Trooper Dugger had reasonable suspicion to engage Odoh in further conversation after the inspection ended, leading to Odoh's voluntarily giving permission for the officers to search his vehicle.

For these reasons,

**IT IS RECOMMENDED** that defendant's MOTION TO SUPPRESS (#22) be denied.

Pursuant to NELR 72.4, any objection to this recommendation may be made by filing a "Statement of Objection to Magistrate Judge's Recommendation" within 10 days after being served with a copy of the recommendation. The statement of objection shall specify those portions of the recommendation to which objection is made and the basis of the objection. The objecting party shall, at the time of filing the objection, file a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made.

**DATED September 20, 2005:**

                                **BY THE COURT:**

                                **s/ F.A. Gossett**
                                **United States Magistrate Judge**